UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

DANIEL R. LONERGAN,

          Plaintiff,

v.                                  Case No: 3:18-cv-812-BJD-JRK

MARK S. INCH and W. MILLETTE,

          Defendants.

_____

## ORDER

### I.    Status

Plaintiff, an inmate of the Florida penal system, is proceeding on an Amended Civil Rights Complaint (Doc. 6) against two Defendants: Mark S. Inch, in his official capacity as the Secretary of the Florida Department of Corrections (FDOC);[1] and W. Millette, in her individual and official capacities. Plaintiff claims that on December 27, 2017, he received a disciplinary report (DR) for violating Florida Administrative Code Rule 33.601.314(9-27) (Rule 9-27), which prohibits the use of unauthorized drugs as evidenced by positive urinalysis results or observable behavior. He claims that Rule 9-27 is unconstitutionally vague, conflicts with Rule 33-602.2035 of the Florida

---

[1] Mark S. Inch was substituted for the former Secretary, Julie Jones. See Order (Doc. 22).

Administrative Code, and allows correctional officers "unbridled discretion" to determine who will be afforded a urinalysis.

Before the Court are the parties' cross-motions for summary judgment. See Plaintiff's Motion for Summary Judgment (Doc. 36); Defendants' Motion for Summary Judgment (Doc. 41). The parties have filed responses. See Defendants' Response in Opposition to Plaintiff's Motion for Summary Judgment (Doc. 44); Plaintiff's Answer to Defendants' Motion for Summary Judgment (Doc. 53).[2] The Motions are ripe for review.

## II.   **Amended Complaint**

Plaintiff alleges that on December 21, 2017, while housed at Union Correctional Institution, he was in the law library when he began suffering from a "gallbladder episode." Plaintiff had been experiencing issues with his gallbladder for one year and "intensely for several weeks before this incident." Security staff was called to assist, and Plaintiff advised the persons present "that he thought perhaps his gallbladder had ruptured." Upon searching Plaintiff, "a candy wrapper was removed from his shirt pocket and Plaintiff was placed in hand restraints and taken to the medical department."

---

[2] In Plaintiff's Response, he states that he would have obtained a declaration from another inmate but was unable to do so because of COVID-19 restrictions. See Doc. 53 at 11 n.2. It is unclear how this declaration would assist Plaintiff, but regardless, if he is seeking relief from the Court, he cannot do so in a response. All requests for relief must be in the form of a motion.

Approximately six minutes after the incident, Plaintiff was "briefly examined by medical personnel." A nurse stated, "'[I]t doesn't appear to me that he's on drugs.'" Plaintiff advised that he was not on drugs, and he requested a urinalysis to confirm. The security staff present told Plaintiff to "shut up," so he did. Plaintiff was taken to confinement and placed in a holding cell. He again requested a urinalysis, but he was told, "'[W]e don't need one you're on drugs.'"

On December 27, 2017, Plaintiff received a DR for violating Rule 9-27 (use of drugs based on observable behavior). According to Plaintiff, the narrative in the DR read as follows:

> On December 21, 2017 at approximately 1345 hours while assigned as shift lieutenant, I responded to an ICS emergency called by Mr. J. Yonn in the SWU library. Upon arriving in the library inmate (Plaintiff) was found sitting in a chair in the corner covering his face and shaking. I attempted to get a response from (Plaintiff) at which time he looked and began speaking to me. Inmate (plaintiff) speech was slurred and he was unable to focus and seemed confused. Inmate (plaintiff) eyes were also dilated. At this time I placed (Plaintiff) in hand restraints as a precautionary measure. A search of inmate (Plaintiff) person found what appeared to be a homemade pipe which consisted of a page out of a magazine wrapped in tape with the end burnt. Inmate (Plaintiff) behavior is consistent with being under the influence of an unauthorized drug.

In accordance with Florida's Administrative Code governing inmate discipline, Plaintiff completed the appropriate form requesting an investigation into the

3

allegations of the DR, and he identified certain actions he desired be taken. On December 29, 2017, Plaintiff appeared before the disciplinary board, entered a plea of not guilty, and explained that he had not used drugs but had been experiencing a medical issue with his gallbladder. He disputed the narrative in the DR and asked whether the disciplinary board had reviewed his pre-confinement medical report, but he was told it was not part of the disciplinary packet. He also asked whether the video had been reviewed, and he was told no. The disciplinary board advised Plaintiff that they had a photocopy of the "pipe" that was confiscated from him, but Plaintiff explained that the "pipe" was a candy wrapper and the alleged resin was candy. He further advised the disciplinary board that he twice requested a urinalysis, but he was told he was not entitled to one.

Plaintiff was found guilty based on the allegations in the DR. He contends that he was deprived of any materials that could form a defense. He was sentenced to sixty days disciplinary confinement, loss of visitation for one year, and cancellation of his good-conduct transfer. He further alleges that he "suffers the stigma of a drug user[,] i.e. staff harass[ment,]" and this infraction "mars his institutional file foreclosing favorable considerations." He also claims that it counts as a "strike" toward close management, negatively affects his parole reviews, and subjects him to "allegedly random urinalysis" testing.

Plaintiff appealed the DR to the Warden by filing a grievance, but his grievance was denied. He appealed the Warden's denial and Defendant Millette approved his grievance for further inquiry. As a result, Plaintiff received an amended response from the Warden, again denying his grievance. Plaintiff appealed again, but this time, Defendant Millette denied the grievance appeal. According to Plaintiff, Defendant "Millette's denial [wa]s without regard to and in contrast with both published opinions of the First District Court of Appeal and the United States Supreme Court. The denial is part of a policy, practice and custom of ignoring mandated FD[O]C disciplinary procedures and corresponding judicial interpretations."

Plaintiff submits that Rule 9-27, on which his DR was based, is unconstitutionally vague,[3] directly conflicts with Rule 33-602.2035 of the Florida Administrative Code,[4] and allows correctional officers "unbridled

---

[3] "Plaintiff is in doubt as to his constitutional right to be free from arbitrary punishment resulting from . . . the unconstitutionally vague rule and the conclusive presumption created thereby."

[4] Rule 33-602.2035 of the Florida Administrative Code states in pertinent part:

> (2) The Department of Corrections conducts the following types of inmate substance abuse testing:
>
> (a) For-Cause or Reasonable Suspicion Testing.
>
> 1. Inmates suspected of involvement with drugs or alcohol shall be subject to for-cause testing upon order of the warden, the duty warden, the correctional officer chief of the facility, a designee of one of the above individuals, or the Office of Institutions. . . . For-cause tests will only be

discretion" to determine who will be afforded a urinalysis. He contends that Defendant Inch has authorized and ratified the Rules. As to Defendant Millette, he asserts that she denied his appeal from the DR "knowing full well that the FD[O]C actions and inactions presented in the appeal violated both Florida and United States precedent, requiring that the appeal be granted." He further states that the denial of the appeal was without regard to his due process rights, and "[t]hat the denial is part of a FD[O]C policy, practice and custom of denying disciplinary appeals without regard to FD[O]C disciplinary procedures and the published opinions clearly establishing the procedures denied Plaintiff." According to Plaintiff, Defendants' above-listed actions violated his Fifth and Fourteenth Amendment rights to due process and equal protection.

---

conducted on inmates who meet the criteria outlined in subparagraphs 2.a. through c. below.

2. For-cause drug testing (also referred to as reasonable suspicion drug testing) means drug testing based on a belief that an inmate is using or has used drugs or alcohol based on specific facts and reasonable inferences drawn from those facts in light of experience. Such facts and inferences shall be based upon:

a. Observable phenomena such as direct observation of drug or alcohol use or of the physical symptoms or manifestations of being under the influence of drugs or alcohol (such as slurred or incoherent speech, erratic or violent behavior, uneven gait, or other behaviors or physical symptoms unusual for the inmate based on the staff member's knowledge of the inmate).

As relief from Defendant Inch, Plaintiff requests a declaratory judgment finding that Rule 9-27 is unconstitutional, injunctive relief preventing the FDOC from using Rule 9-27 without also requiring a urinalysis, expungement of the DR from Plaintiff's file, and reinstatement of his visitation privileges and good-adjustment transfer. Against Defendant Millette, Plaintiff requests declaratory relief that she violated Plaintiff's constitutional rights and nominal damages.[5] Plaintiff also seeks fees and costs.

### III.   <u>Summary Judgment Standard</u>

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742 (11th Cir. 1996) (quoting <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere

---

[5] The Court previously dismissed all claims for monetary damages against Defendant Millette in her official capacity only. <u>See</u> Order (Doc. 26). Additionally, Plaintiff's requests made in his Amended Complaint for reinstatement of his visitation privileges and good-adjustment transfer are now moot. <u>See</u> Doc. 41-2 at 1 (Plaintiff's letter to defense counsel, acknowledging that he no longer desires to be transferred from his current institution and his visitation suspension has now expired); <u>see also</u> Plaintiff's Motion (Doc. 36) at 13 (requesting a declaration that Rule 9-27 violates his Fourteenth Amendment rights and the disciplinary report be removed from his file); Plaintiff's Response (Doc. 53) at 18-19 (same).

scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is

appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)).

"The principles governing summary judgment do not change when the parties file cross-motions for summary judgment. When faced with cross-motions, the Court must determine whether either of the parties deserves judgment as a matter of law on the undisputed facts." <u>T-Mobile S. LLC v. City of Jacksonville, Fla.</u>, 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008).

## IV.   <u>Analysis</u>[6]

After reviewing the parties' filings and considering the applicable law, the Court finds that Defendants are entitled to entry of summary judgment in their favor. In their Motion, Defendants make the following arguments: (1) Plaintiff cannot demonstrate a due process violation because he does not have a liberty or property interest that would give rise to due process protections,

---

[6] Although Plaintiff states that Defendants violated his rights to equal protection, neither party briefed the issue. Regardless, the Court finds that even assuming Plaintiff's averments in his Declaration (Doc. 36-3 at 3) show that he was treated differently than similarly situated inmates, he fails to allege that such discriminatory treatment was based on a protected interest. <u>See</u> <u>Jones v. Ray</u>, 279 F.3d 944, 946-47 (11th Cir. 2001) ("To establish an equal protection claim, a prisoner must demonstrate that (1) 'he is similarly situated with other prisoners who received' more favorable treatment; and (2) his discriminatory treatment was based on some constitutionally protected interest such as race." (quoting <u>Damiano v. Fla. Parole & Prob. Comm'n</u>, 785 F.2d 929, 932-33 (11th Cir. 1986))). Therefore, insofar as Plaintiff raises an equal protection claim, it is due to be dismissed.

and even if he did, he received all the process to which he was entitled; (2) Defendant Millette is entitled to qualified immunity and Plaintiff has failed to demonstrate a constitutional violation for the denial of his grievances; (3) Plaintiff lacks standing to challenge Rule 9-27; (4) Plaintiff failed to exhaust his administrative remedies;[7] (5) Rule 9-27 is constitutional; and (6) Plaintiff is not entitled to injunctive relief.

### A. Due Process Claim

"[A] § 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003); see Moulds v. Bullard, 452 F. App'x 851, 854-55 (11th Cir. 2011) (recognizing that an inmate is entitled to procedural due process protections if he is deprived of a protected liberty interest).

> Whether an inmate has a protected liberty interest that would entitle him to due process protections "is often a difficult determination in the context of a prison, because prisoners have already been deprived

---

[7] In a footnote buried on page 37 of Defendants' Motion, Defendant Inch "requests that this Court consider deferring ruling on this Motion until such time as the Eleventh Circuit" reaches a decision in a pending appeal that raises the same exhaustion issue. See Doc. 41 at 37 n.10. This Court previously denied Defendants' motion to dismiss based on exhaustion, see Order (Doc. 26), and denied Defendants' motion to stay this case pending the Eleventh Circuit's decision, see Order (Doc. 39). The Court reaffirms its previous decision to deny Defendants' requests. Regardless, given the Court's findings herein, it need not address the exhaustion argument.

of their liberty in the ordinary sense of the term." <u>Bass</u>, 170 F.3d at 1318.[8] In <u>Sandin v. Conner</u>, 515 U.S. 472 (1995), the Supreme Court gave us the test for determining whether a convicted inmate has a protected liberty interest. This test examines the hardship imposed on the inmate relative to the "basic conditions" of prison life. <u>See id.</u> at 485. Under this test, a convicted inmate is entitled to procedural due process in two circumstances. First, he is entitled to a measure of procedural due process when an increased restraint "exceed[s] [his] sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force." <u>Id.</u> at 484. Second, he is entitled to a measure of procedural due process when a change in his conditions of confinement "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." <u>Id.</u>

<u>Jacoby v. Baldwin Cnty.</u>, 835 F.3d 1338, 1346-47 (11th Cir. 2016) (internal citations modified).

Initially, the Court notes that Plaintiff does not allege that either named Defendant was personally involved in his disciplinary proceeding.[9] Rather, he attempts to hold them liable because Defendant Inch authorized and ratified the Rules, and Defendant Millette denied his grievance appeal without regard

---

[8] <u>Bass v. Perrin</u>, 170 F.3d 1312 (11th Cir. 1999).

[9] In the Amended Complaint, Plaintiff alleges that "[a]s a direct result of Officer Chittum refusing to conduct the investigation as sought by Plaintiff and required by the FAC, Plaintiff was denied the opportunity to present a meaningful defense and thus a fair DR hearing." Plaintiff did not name Officer Chittum as a defendant in this case.

to his due process rights as part of an FDOC policy, practice, and custom. For the reasons explained herein, Plaintiff's claims fail.

Plaintiff did not lose any gain time as a result of the disciplinary infraction.[10] Nor has he alleged facts suggesting that his sixty-day stay in disciplinary confinement imposed on him an "atypical and significant hardship" relative to the ordinary incidents of prison life. Sandin, 515 U.S. at 484; see also Jacoby, 835 F.3d at 1347 ("Said another way, convicted inmates have no right to a due process hearing before being punished for disciplinary infractions unless the punishment is demonstrably harsher than the ordinary conditions of prison life."). Thus, Plaintiff did not have a protected liberty interest in his designation to disciplinary confinement; and therefore, due process protections were not triggered.

Similarly, Plaintiff does not have a liberty interest with respect to his temporary loss of visitation privileges and cancellation of his good-conduct

---

[10] Notably, Plaintiff did not have any gain time to lose. See Doc. 41-3 at 2 (noting that the maximum gain time days available to be taken were zero). Indeed, as a life-sentenced inmate, Plaintiff is not eligible to earn gain time. See Sanford v. Inch, No. 1:20-cv-68-AW-GRJ, 2020 WL 2528928, at *3 (N.D. Fla. Apr. 1, 2020) ("As an inmate sentenced to life imprisonment, Plaintiff is ineligible to receive gain time."), report and recommendation adopted, No. 1:20-CV-68-AW-GRJ, 2020 WL 2528109 (N.D. Fla. May 18, 2020); see also Fla. Stat. § 944.275(3)(a), (4)(f) (requiring the FDOC to "establish for each prisoner sentenced to a term of years a 'tentative release date' which shall be the date projected for the prisoner's release from custody by virtue of gain-time granted or forfeited," and recognizing that "[s]tate prisoners sentenced to life imprisonment shall be incarcerated for the rest of their natural lives, unless granted pardon or clemency" (emphasis added)).

transfer.[11] See Charriez v. Sec'y, Fla. Dep't of Corr., 596 F. App'x 890, 893 (11th Cir. 2015) ("The Supreme Court has held that an inmate does not have a liberty interest in or right to 'unfettered visitation' and thus denial of visitation is not protected by the Due Process Clause."); West v. Higgins, 346 F. App'x 423, 426 (11th Cir. 2009) ("An inmate has no liberty interest in a particular classification, prison assignment, or transfer even if the inmate loses access to rehabilitative programs and experiences more burdensome conditions than before. Other examples of prison decisions not giving rise to liberty interests include transfers to other prisons and visitation." (citations omitted)).

Plaintiff also contends that being found guilty of this disciplinary infraction has marred his reputation and "foreclos[es] favorable considerations," and that he "suffers the stigma of a drug user[,] i.e. staff harass[ment]." However, "injury to reputation, by itself, does not constitute the deprivation of a liberty or property interest protected under the Fourteenth Amendment." Jordan v. Sec'y, Fla. Dep't of Child. & Fam. Servs., 723 F. App'x 690, 694 (11th Cir. 2018). And Plaintiff has not shown injury to his reputation "plus the violation of some more tangible interest." Id. (citing Paul v. Davis, 424 U.S. 693, 701-02 (1976)); see Farr v. Rodriguez, 255 F. App'x 925, 926 (5th Cir. 2007) ("To the extent [the prisoner-plaintiff] alleges a stigma from being

---

[11] Regardless, Plaintiff's one-year loss of visitation privileges has since expired, and he no longer seeks a good-conduct transfer. See supra n.4.

classified as a gang member, the classification, without more, is insufficient to raise a constitutional claim."). Indeed, his assertions that his DR counts as a "strike" toward placement on close management, negatively affects his parole reviews, and subjects him to "allegedly random urinalysis" testing are speculative, at best. See Sandin, 515 U.S. at 487 ("The chance that a finding of misconduct will alter the balance [in a parole decision] is simply too attenuated to invoke the procedural guarantees of the Due Process Clause."); see also Walker v. Fla. Parole Comm'n, 299 F. App'x 900, 902 (11th Cir. 2008) ("The Constitution does not confer a liberty interest in parole, and the Florida statutes do not create a liberty interest in parole, because the decision whether to release an inmate on parole is a matter committed to the discretion of the Commission without the mandate of statute." (citations omitted)).

In sum, Plaintiff did not have a constitutionally protected interest that triggered due process protections in his disciplinary proceeding.[12] Thus, Defendants are entitled to summary judgment on Plaintiff's due process claims against them.

---

[12] Given this finding, the Court need not address Defendants' alternative argument that Plaintiff received all the process he was due.

## B. Standing to Challenge and Constitutionality of Rule 9-27

Defendants argue that "Plaintiff lacks standing to challenge the constitutionality of the administrative rule as he . . . suffers no continuing, present adverse effects." Doc. 41 at 28.

> [A] party seeking to invoke the subject matter jurisdiction of a federal court must establish the following:
>
> > First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.
>
> Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (page numbers, quotation marks, citations, brackets, and ellipses omitted).

Enders v. Fla., 535 F. App'x 799, 801 (11th Cir. 2013) (internal citation modified).

Here, to the extent Plaintiff challenges Rule 9-27 as violative of his due process rights, Plaintiff has not "suffered an injury in fact." As explained above, he did not suffer "an invasion of a legally protected interest." And "[p]ast

15

exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983) (internal quotations and citation omitted). Plaintiff has not shown that he has a continuing, present adverse effect from the alleged unconstitutional Rule. And the fact that he may be subjected to this Rule in the future is speculative.

Nevertheless, assuming Plaintiff does have standing, the Court substantively addresses his claim. Plaintiff's main contentions are that Rule 9-27 is unconstitutionally vague, conflicts with Rule 33-602.2035 of the Florida Administrative Code, and allows correctional officers "unbridled discretion" to determine who will be afforded a urinalysis.

Courts "accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." Overton v. Bazzetta, 539 U.S. 126, 132 (2003). Thus, the burden "is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." Id.

> "Unlike the strict standards of scrutiny applicable to the constitutional rights of persons in free society, the Supreme Court has adopted a deferential standard for determining whether a prison regulation violates an inmate's constitutional rights," and "[a] prison regulation, even though it infringes the inmate's constitutional rights, is an actionable

constitutional violation only if the regulation is unreasonable." <u>Hakim v. Hicks</u>, 223 F.3d 1244, 1247 (11th Cir. 2000). In examining the reasonableness of the regulation, we use the standard announced by the Supreme Court in <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987), and consider the following factors:

> (1) whether there is a "valid, rational connection" between the regulation and a legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; (3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates, and the allocation of prison resources generally; and (4) whether the regulation represents an "exaggerated response" to prison concerns. <u>Hakim</u>, 223 F.3d at 1247-48.

<u>Smith v. Fla. Dep't of Corr.</u>, 318 F. App'x 726, 729 (11th Cir. 2008) (internal citations modified).

In support of their position, Defendants submitted the Declaration of Michael Harrell, the Bureau Chief of Security Operations in the Office of Institutions for the FDOC, <u>see</u> Doc. 41-4, and the Declaration of Robert Chris Hendry, the Bureau Chief of the Bureau of Professional Development and Training, <u>see</u> Doc. 41-5. Mr. Harrell, who has twenty-seven years of experience working in security, states in pertinent part:

> First, the rule [(Rule 9-27)], like any disciplinary charge, is a necessary means of policing the use of

drugs inside of our prisons. It creates a deterrent to inmate illegal drug usage by creating a penalty for engaging in that prohibited behavior through the potential loss of gain time or the temporary suspension of privileges. The rule is not simply a means to discipline inmates, but is intended to create a deterrent effect to protect the inmate population from the dangers of illegal drug use. Those dangers include both the physical dangers of illicit drug use to the inmate as well as the dangers inherent in the trade, bartering, and concealment of drugs, just as with any type of contraband. Of particular concern in this regard is the fact that trading and bartering amongst inmates creates debts between inmates which often result in inmate-on-inmate violence.

Another Security concern that requires the Department to be able to effectively prevent and deter the use of drugs by inmates are the necessary interactions between correctional officers and inmates who are under the influence. The danger to both officers and inmate increases substantially when an inmate is under the influence. Often times, when officers encounter inmates who are under the influence of dangerous drugs, especially K2, the inmate becomes combative. These encounters often result in a lawful use of force by responding officers which increases the danger to both staff and inmate. Due to the hard fixtures found in a prison environment, such as metal furniture, concrete floors, etc., inmates and officers are both very likely to sustain injury when use of force incidents occur. This risk is exacerbated when inmates are under the influence of K2 or other dangerous drugs, as a result of an inmate's extreme agitation and unpredictable actions.

It has been my experience that inmates will resort to extreme measures to prevent getting caught using illegal or dangerous drugs and we have seen this become even more prevalent since the appearance of

K2 within our prisons. In recent history, the
Department saw a rapid increase in the misuse of K2
which is a drug known for being difficult to test for.
Additionally, inmates have also been known to ingest
dangerous substances, such as roach spray, and other
household chemicals sprayed on a smokable medium
to avoid detection via urinalysis testing. Accordingly,
the ability of the Department to discipline an inmate
for use of drugs based solely on observable behavior is
paramount to protect inmates from the dangers of this
type of behavior, and necessary as a result of the
various drug substances that avoid detection via
available tests. If the Department were unable to
render disciplinary charges against an inmate for the
use of drugs based on observable behavior
demonstrating that an inmate was under the influence
unless there was also a positive drug test, the number
of inmates who had used drugs and could be
disciplined using the established process would
greatly decline, and inmate drug abuse would be
expected to increase exponentially as the disciplinary
report process would no longer be an effective
deterrent.

Doc. 41-4 at 1-3.

Mr. Hendry provides the following information about the training FDOC

officers receive to assist them in "determining drug usage via the observable

behavior of inmates":

First, the Basic Correctional Recruit Handbook
includes a unit on substance abuse among inmates,
which all correctional officers receive and are trained
on as part of basic recruit training, including an
additional unit covering "Constitutional Rights,
Inmate Rights and Legal Issues with Contraband"
more specifically.

Second, our officers undergo additional courses which present an overview of the identification of current substances of abuse and the associated paraphernalia law enforcement officers will likely encounter in their duties. Areas including Drug Scheduling, appearance, observable effects on the human body, methods of ingestion, possible medicinal and/or cultural uses, slang terminology, cultivation, production, manufacture, and distribution of the prevalent substances within the seven categories of drugs are described in those courses as well as an emphasis on officer safety issues for encountering users of these drugs. At the conclusion of these courses, officers are able to address all of the above, including the ability to state the observable effects on the human body of various substances of abuse. Some of the courses include, but are not limited to, drug identification, drug identification in conjunction with visitation security, and courses on the dangers of opioids and how to administer opio[i]d reversal products.

Doc. 41-5 at 1-2 (footnote omitted).

Considering the evidence presented, it is clear that Rule 9-27 is reasonably related to legitimate penological interests. The affidavits submitted by Defendants show that the purpose of Rule 9-27 is to prevent drug use among inmates, which directly and logically correlates to the legitimate objective of maintaining safety and order in a prison. This Rule did not infringe on Plaintiff's due process rights, because as discussed above, he did not have a protected liberty interest triggering due process protections. Regardless, there are various administrative and judicial remedies available to him to vindicate any alleged due process violation. Precluding correctional staff from issuing

disciplinary charges for drug use unless there is a positive urinalysis test would increase drug use and costs, and it would decrease the ability to effectively deter inmate drug use. And the Rule is not an exaggerated response to prison concerns. Indeed, it is abundantly clear from the record that eliminating drug use in prisons is a valid, serious concern, and permitting trained correctional staff to observe an inmate's behavior and issue an appropriate disciplinary charge is a reasonable response to that concern—especially in light of the various substances available that may avoid detection on a urinalysis test.

Plaintiff acknowledges the legitimate interests in preventing drug use in prison, but he contends that the FDOC achieved its goal by creating Rule 33-602.2035, and the "observable behavior" portion of Rule 9-27 "was never intended to []exist." Doc. 53 at 6. To adequately address Plaintiff's argument, the Court sets forth the pertinent substance of the Rules.

Rule 9-27 creates a disciplinary charge and provides the maximum penalties that may be imposed upon an inmate that is found guilty of using an unauthorized drug as evidenced by positive test results or observable behavior. Rule 33-602.2035, entitled Inmate Substance Abuse Testing, describes the types of inmate substance abuse testing and the attendant procedures. In pertinent part, that Rule provides that "[i]nmates suspected of involvement with drugs or alcohol shall be subject to for-cause testing." Fla. Admin. Code r.

33-602.2035(2)(a)(1). For-cause testing may be ordered based on "[o]bservable phenomena such as . . . the physical symptoms or manifestations of being under the influence of drugs or alcohol (such as slurred or incoherent speech, erratic or violent behavior, uneven gait, or other behaviors or physical symptoms unusual for the inmate based on the staff member's knowledge of the inmate)." Fla. Admin. Code r. 33-602.2035(2)(a)(2)(a).

There is nothing inherently contradictory about these two Rules. Rule 33-602.2035 alerts inmates that they may be subject to for-cause testing if they are suspected of using drugs based on observable phenomena such as exhibiting the "physical symptoms or manifestations of being under the influence." It does not, however, require testing even if the inmate is suspected of using drugs. Plaintiff points to the legislative intent behind Rule 33-602.2035, arguing it does not mention that correctional staff may find an inmate guilty of using drugs based on observable behavior alone. Even if that is true, that would not necessarily render Rule 9-27 unconstitutional.

Moreover, Rule 9-27 does not create a conclusive presumption as Plaintiff contends. Insofar as Plaintiff attempts to make a facial challenge to the Rule in this regard, he has failed to show that an inmate charged under Rule 9-27 is automatically found guilty without the ability to rebut the allegations in a DR. As applied to Plaintiff, that he was unable to present certain evidence does not necessarily mean Rule 9-27 creates a conclusive

22

presumption.[13] Indeed, whether Rule 9-27 is constitutional is a different analysis from whether Plaintiff's due process rights were violated.

Finally, as to Plaintiff's "vagueness" argument, the Court finds that Rule 9-27 is not vague. An ordinary prisoner would know that unauthorized drug use may subject him to discipline, and that he may be found guilty of unauthorized drug use based on his behavior. Correctional officers are specifically trained on "the observable effects on the human body of various substances of abuse," and as previously found, this Rule is not unreasonable. Plaintiff has not provided any evidence to suggest that officers are given "unbridled discretion" in the enforcement of this Rule. His averment that another inmate was charged with violating Rule 9-27 when the inmate was actually suffering from a seizure and was denied a preconfinement medical screening does not support his argument. Neither does his averment that a different inmate was found guilty of violating Rule 9-27, despite the fact that said inmate underwent three urinalysis tests that were all negative.[14]

---

[13] Plaintiff did not request a urinalysis test on the documentary or physical evidence disposition form. See Doc. 41-3 at 9. He requested the video from the library, a witness statement from Mr. Yonn, a "[t]est from burnt paper," a certification of Mr. Hughes regarding drug behavior training, and his medical records from the preconfinement physical. Id.

[14] Notably, even individuals who are not incarcerated may be subjected to criminal charges based on law enforcement's observations of the individual's behavior. See Tyner v. State, 805 So. 2d 862, 865 (Fla. 2001) (recognizing that the state could prove an individual is guilty of driving under the influence "without resort to evidence of blood alcohol levels" by showing proof of "such things as the driver's odor of alcohol; witnesses who observed the driver consuming alcohol; evidence of the physical

The Court finds Plaintiff has failed to show that Rule 9-27 is unconstitutional. Therefore, Defendants' Motion is due to be granted in this regard.

### C. Qualified Immunity - Defendant Millette

"The qualified immunity defense shields 'government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Corbitt v. Vickers, 929 F.3d 1304, 1311 (11th Cir. 2019) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The doctrine protects all but the plainly incompetent or those who knowingly violate an inmate's constitutional rights. Alcocer v. Mills, 906 F.3d 944, 951 (11th Cir. 2018). In other words, "[q]ualified immunity shields an officer from suit when [he] makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [he] confronted." Taylor v. Riojas, 141 S. Ct. 52, 53 (2020) (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004)).

"To be entitled to qualified immunity, the defendant must first establish that he was acting within the scope of his discretionary authority." Gaines v. Wardynski, 871 F.3d 1203, 1208 (11th Cir. 2017) (citation omitted). If the

---

impairment of the driver; or evidence of an erratic manner of driving and other related and relevant evidence").

defendant so shows, the burden shifts to the plaintiff to demonstrate that the defendant violated his constitutional rights and at the time of the violation, those rights were clearly established. Id.

Here, there is no doubt that Defendant Millette was acting within the scope of her discretionary authority when she addressed Plaintiff's grievances. Thus, the burden shifts to Plaintiff to show that she violated his clearly established rights. However, as addressed above, Plaintiff has failed to show a violation of his procedural due process rights, nor has he shown that Rule 9-27 is otherwise unconstitutional. Additionally, simply denying a grievance, without more, does not render one liable for the underlying constitutional violation. See, e.g., Jones v. Eckloff, No. 2:12-cv-375-FTM-29DNF, 2013 WL 6231181, at *4 (M.D. Fla. Dec. 2, 2013) (unpublished) ("[F]iling a grievance with a supervisory person does not automatically make the supervisor liable for the allegedly unconstitutional conduct brought to light by the grievance, even when the grievance is denied." (collecting cases)). And inmates have "no constitutionally protected liberty interest in access to the prison's grievance procedure[; therefore, Plaintiff] cannot base a § 1983 claim on the Defendant[']s response to his grievances." Moore v. McLaughlin, 569 F. App'x 656, 659 (11th Cir. 2014) (citing Bingham v. Thomas, 654 F.3d 1171, 1177 (11th Cir. 2011); Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003)); see Charriez, 596 F. App'x at 895 (finding the district court did not err in dismissing the plaintiff's

25

claim that the defendants "had violated his constitutional due-process rights by failing to take corrective action during the appeal of the suspension of his visitation privileges[ b]ecause the prison grievance procedure does not create a protected liberty interest"); Mathews v. Moss, 506 F. App'x 981, 984 (11th Cir. 2013) (finding the plaintiff failed to state a claim because he merely "alleged that his prison grievances were either ignored or wrongly decided or that prison officials did not properly follow the prison's own grievance procedures"); Wromas v. Cruz, No. 2:17-cv-155-FtM-99MRM, 2018 WL 2318038, at *2 (M.D. Fla. May 22, 2018) (unpublished) ("[A] prison official's failure to timely process a grievance form, investigate it, or otherwise respond to a grievance is not actionable under § 1983."). As such, Defendant Millette is entitled to qualified immunity as to the claims against her in her individual capacity.

### D. Injunctive Relief

Plaintiff seeks injunctive relief preventing the FDOC from using Rule 9-27 without also requiring a urinalysis test and expungement of the DR from his file. "To obtain a permanent injunction, a plaintiff must show (1) that he has suffered an irreparable injury; (2) that his remedies at law are inadequate; (3) that the balance of hardships weighs in his favor; and (4) that a permanent injunction would not disserve the public interest." Barrett v. Walker Cnty. Sch.

26

<u>Dist.</u>, 872 F.3d 1209, 1229 (11th Cir. 2017). Plaintiff has not met his burden, and his requests for injunctive relief are due to be denied.

Accordingly, it is

**ORDERED**:

1.     Plaintiff's Motion for Summary Judgment (Doc. 36) is **DENIED**.

2.     Defendants' Motion for Summary Judgment (Doc. 41) is **GRANTED**.

3.     The **Clerk** shall enter judgment in favor of Defendants and against Plaintiff, terminate any pending motions, and close the file.

**DONE AND ORDERED** in Jacksonville, Florida, this 10th day of August, 2021.

_____
BRIAN J. DAVIS
United States District Judge


JAX-8/6
c:
Daniel R. Lonergan, #084131
Counsel of Record